**Z–NOORANI, INC., Plaintiff,**

v.

**Gregory A. RICHARDSON, Director of the Texas Service Center, U.S. Citizenship and Immigration Services, Alejandro Mayorkas, Director of U.S. Citizenship and Immigration Services, Janet Napolitano, Secretary, Department of Homeland Security, and Eric H. Holder, Jr., U.S. Attorney General, Defendants.**

**Civil Action No. 2:12–CV–00115–WCO.**

United States District Court,
N.D. Georgia,
Gainesville Division.

June 5, 2013.

Leslie A. Diaz, Siskind Susser P.C., Atlanta, GA, for Plaintiff.

Aaron S. Goldsmith, United States Department of Justice, Washington, DC, Aileen Bell Hughes, Office of United States Attorney, Atlanta, GA, Defendants.

## ORDER

WILLIAM C. O'KELLEY, Senior District Judge.

The court has before it for consideration plaintiff's "Claim for Declaratory Judgment" [15], plaintiff's "First Motion to Supplement and File Under Seal" [16], plaintiff's "Second Motion to Supplement the Record" [17], and defendants' "Response to Plaintiff's Motion for Judgment and Cross–Motion for Summary Judgment" [18].

### I. General Factual and Procedural Background

Plaintiff is a Georgia corporation in the business of operating a convenience store known as "Saad's Express" in Oakwood, Georgia. On April 25, 2001 (the "Priority Date"), plaintiff filed an Application for Employment Certification (Forms ETA–750A and ETA–750B) for Dilshad Gilani ("Gilani") for the position of store manager. The position required two years of experience and had an annual wage of $36,600 per year. This application was approved and certified on February 22, 2003, by the Department of Labor (the "Labor Certification"). Plaintiff then filed

an I–140 Petition for Alien Worker on Gilani's behalf on April 16, 2004, to sponsor her for permanent residence based on her employment with the plaintiff. The I–140 was approved on March 1, 2005.

Four years after the labor certification was filed, Gilani left plaintiff's employ. In accordance with USCIS procedures, plaintiff withdrew the approved I–140 petition for Gilani and substituted another alien, Imroze Mohammad ("Mohammad"), in her place. On April 17, 2007, plaintiff filed a new I–140 petition on behalf of Mohammad. This I–140 petition was denied on July 14, 2008, after the Service Center Director determined that Mohammad had failed to provide adequate evidence of his work experience from 2000 to 2008.

On August 13, 2008, plaintiff filed a Motion to Reconsider the denial of the I140 and, in the alternative, appealed the decision to the USCIS's Administrative Appeals Office ("AAO"). The Motion to Reconsider was denied, and the case was transferred to the AAO.

On December 17, 2008, the AAO issued a Notice of Derogatory Information (the "First NDI"). The First NDI identified two potential problems with the I–140. First, the USCIS had reason to believe that Mohammad was the son of plaintiff's Vice President, Zubeda Mohammad. This suggested that Mohammad may have an ownership interest in plaintiff which, if true, raised concerns about whether the employment offer was bona fide. Second, it was unclear whether Mohammad had the requisite two years of relevant work experience prior to the Priority Date.

Plaintiff responded on January 15, 2009. Plaintiff submitted corporate minutes, loan documents, and licensing documents in an effort to show that Mohammad did not have an ownership interest in plaintiff. Plaintiff also attempted to disprove any suggestion that it had materially misrepresented Mohammad's relationship to plaintiff's owners by noting that the original beneficiary of the Labor Certification was not a relative, and the form in use at the time the Labor Certification was filed did not specifically ask about a familial relationship. As to Mohammad's prior work experience, plaintiff explained that Mohammad had spent two years working for Shiza, Inc., a company that had previously owned and operated Saad's Express. When plaintiff purchased Saad's Express from Shiza, Inc. in 2000, Mohammad had already been working there for two years.

On November 17, 2009, the AAO issued a second Notice of Derogatory Information (the "Second NDI"). The Second NDI again questioned whether the employment offer was bona fide, this time because the AAO had discovered that plaintiff's director, Ramzan Ali Mohammad, had left his last name off of several documents, including the I–140 form, and signed simply as "Ramzan Ali." The AAO felt that this was a deliberate attempt to hide the fact that Ramzan Ali was Mohammad's father. The Second NDI also restated concerns about Mohammad's prior work experience. Specifically, the AAO noted that Mohammad was not listed as an employee on plaintiff's tax returns for 2004, which was one of the years Mohammad claimed to have worked for plaintiff. The AAO requested payroll records to help explain this inconsistency. Finally, the AAO questioned whether plaintiff had three to four employees for Mohammad to supervise because on February 5, 2007, plaintiff had indicated that it had only three active employees, two of whom were Mohammad and his supervisor. The AAO asked plaintiff to submit a variety of tax forms to resolve this inconsistency. The requested forms included plaintiff's W–3 Forms for the years 2000 through 2008, 941 Forms for each quarter of 2007 and 2008, and any 1099 or W–2 Forms issued

to employees other than Mohammad from 2000 through 2008.

Plaintiff responded to the Second NDI in December, 2009. Plaintiff argued that there was no material misrepresentation as to Mohammad's relationship with plaintiff's owners because (1) neither the ETA–750 Forms nor the I–140 Form asked whether a familial relationship existed between the owners and the beneficiary, (2) Ramzan Ali commonly signed without using his surname Mohammad, and (3) Zubeda Mohammad, Mohammad's mother, had made no effort to hide her relationship to Mohammad when she signed the ETA–750 Form. Additionally, plaintiff argued that the AAO should find a bona fide job offer existed since the original Labor Certification was filed for Gilani and Mohammad was already employed in the position at the time of the substitution. As to the concerns raised over Mohammad's prior work experience, plaintiff argued that whether Mohammad was employed in 2004 was irrelevant because he had already established that he had two years of relevant work experience prior to the Priority Date. Nevertheless, plaintiff submitted a 1099 Form for Mohammad for the year 2004. Lastly, plaintiff submitted evidence that it had maintained at least five employees since 2007.

On September 26, 2011, the AAO issued a notice of denial for three different reasons: (1) plaintiff failed to establish that Mohammad possessed two years of experience in the job offered as of the Priority Date; (2) plaintiff failed to establish its continuing ability to pay the proffered wage; and (3) plaintiff failed to demonstrate that the job offer remained realistic and bona fide from the priority date onward.

On May 21, 2012, plaintiff filed this action seeking a declaratory judgment that (1) the position constitutes a bona fide job offer; (2) the AAO's denial of plaintiff's I–140 petition was without basis in fact or law and contrary to and inconsistent with applicable immigration statutes, regulations, and operating instructions; and (3) no material misrepresentation occurred in this case.[1] Plaintiff also seeks attorney's fees and costs under the Equal Access to Justice Act.

Following a Scheduling Conference held on October 17, 2012, defendants filed the Administrative Record ("AR") under seal.[2] Soon thereafter, plaintiff filed a motion for declaratory judgment. Simultaneously with its motion, plaintiff filed two motions to supplement the AR. These motions sought to file (1) the Administrative Record for the I–140 Petition for Alien Worker filed on behalf of Gilani (the "Gilani Record") and (2) a USCIS policy memorandum on the procedures for the determination of ability to pay under 8 C.F.R. § 204.5(g)(2) dated May 4, 2004 (the "Policy Memorandum"). Defendants oppose both motions to supplement and filed a cross-motion for summary judgment in response to plaintiff's motion for declaratory judgment.

## II. Standard of Review
### A. Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp.*

---

1. Subject matter jurisdiction is asserted under 28 U.S.C. § 1331 (federal question jurisdiction) and 5 U.S.C. § 701 *et seq.* (the Administrative Procedure Act).

2. The AR is approximately 1,000 pages long.

v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir.2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." Id. at 1260.

The moving party may demonstrate the absence of a genuine dispute of material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ... admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). In addition to the materials cited by the parties, the court may also refer to other materials in the record. Id. at 56(c)(3). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion" by "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quotation marks omitted).

This initial responsibility is discharged when the movant shows that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Id. at 322, 106 S.Ct. 2548. Once the moving party has met this initial burden, the nonmoving party must "go beyond the pleadings" and, utilizing its own evidentiary submissions or those already filed, demonstrate that there is a genuine dispute of material fact such that a trial is required. Id. at 324, 106 S.Ct. 2548. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

If "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment is appropriate. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir.1997) (internal quotation marks omitted). Thus, the moving party is entitled to "judgment as a matter of law" only when the nonmoving party fails to make a sufficient showing of an essential element of the case on which the nonmoving party bears the burden of proof. Celotex Corp., 477 U.S. at 322, 106 S.Ct. 2548. On the other hand, if the nonmovant "demonstrate[s] that there is indeed a material issue of fact ... [such that] the jury could reasonably find for that party," summary judgment must be denied. Allen, 121 F.3d at 646.

**B. Administrative Procedure Act**

 Under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq., agency actions, findings, and conclusions can be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E). This standard is "exceedingly deferential." Fund for Animals, Inc. v. Rice, 85 F.3d 535, 541 (11th Cir.1996). "To determine whether an agency decision was arbitrary or capricious, the reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there had been a clear error of judgment." (Id.) Examples of when an agency decision is arbitrary or capricious include when the agency relied on factors not intended by Congress, when it entirely failed to consider an important aspect, or when it offered an explanation that was contrary to the evidence or completely implausible. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

1336

■ The focal point for judicial review of an administrative agency's action is the administrative record. *Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir.1996). The reviewing court does not "conduct its own investigation and substitute its own judgment for the administrative agency's decision." *Id.* Instead, the court is "to decide, on the basis of the record the agency provides, whether the action passes muster under the appropriate APA standard of review." *Id.* (citation omitted). Administrative decisions "should be set aside ... only for substantial procedural or substantive reasons as mandated by statute, ... not simply because the court is unhappy with the result reached." *N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1538–39 (11th Cir. 1990) (citation and internal quotation marks omitted).

### III. Motions to Supplement

■ Here, plaintiff has filed two motions to supplement the AR. The first motion seeks to supplement the AR with the Gilani Record. Plaintiff argues the Gilani Record should have been considered by defendants in evaluating plaintiff's I–140 because it establishes that the Department of Labor and the USCIS previously approved an I–140 for the same position (thus suggesting that the job offer made to Mohammad was bona fide) and it is standard procedure to consider other petitions filed by any parties to the case. The second motion seeks to supplement the AR with the Policy Memorandum. Plaintiff argues the Policy Memorandum sets forth the procedures to be used in making an ability to pay determination and thus should have been considered by defendants in evaluating plaintiff's application. Defendants oppose both motions on the basis that neither the Gilani Record nor the Policy Memorandum was considered in adjudicating plaintiff's I–140.

As noted above, the scope of judicial review is generally limited to the record the agency presents to the reviewing court. *Preserve Endangered Areas of Cobb's History, Inc.*, 87 F.3d at 1246. However, "certain circumstances" may justify going beyond the administrative record. *Id.* Supplementation of the administrative record may be appropriate where: "1) an agency's failure to explain its action effectively frustrates judicial review; 2) it appears that the agency relied on materials not included in the record; 3) technical terms or complex subjects need to be explained; or 4) there is a strong showing of agency bad faith or improper behavior." *Id.* at 1246 n. 1 (citing *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1436–37 (9th Cir.1988)). Even so, these exceptions must be narrowly construed, and a party seeking to supplement the administrative record must meet "a heavy burden to show that supplementation is necessary." *Kirkpatrick v. White*, 351 F.Supp.2d 1261, 1272 (N.D.Ala.2004) (citations and internal quotations omitted).

Applying this standard, the court concludes that plaintiff's motions to supplement must be denied. Plaintiff does not argue that either the Gilani Record or the Memorandum fall under any of the exceptions recognized by the Eleventh Circuit, and the court finds nothing in plaintiff's arguments that would necessitate expanding the court's review beyond the already extensive AR. With regard to the Gilani Record, plaintiff admits that "the crucial facts that Plaintiff seeks to demonstrate are present in the record as it stands." (Pl.'s Reply Mot. Supp. ¶ 3, ECF No. 21.) With regard to the Policy Memorandum, plaintiff concedes that it is not binding on the USCIS and simply "memorializes the policies that USCIS uses to determine ability to pay," which are "set out in other resources." (*Id.* ¶ 5.) In fact, the various agency decisions contained in the record

recite the administrative procedures set forth in the Policy Memorandum and reference a variety of case law that applies and interprets those procedures. In light of the above, the court determines that plaintiff has failed to meet its "heavy burden" and "show that supplementation is necessary." *Kirkpatrick*, 351 F.Supp.2d at 1272. Therefore, plaintiff's motions to supplement are denied, and the court will not consider these documents in reviewing the AAO's decision in this case.

## IV. Motion for Declaratory Judgment

The court now turns to plaintiff's motion for declaratory judgment. The AAO denied plaintiff's I–140 petition for the following three reasons: (1) plaintiff failed to demonstrate that Mohammed has the requisite two years prior work experience in the job classification; (2) plaintiff failed to demonstrate that it had the continuing ability to pay the beneficiary's salary at all times since the priority date of the Labor Certification; and (3) the job offer is not bona fide. Each was identified as an independent and alternative basis for denial. (AR 20.) Therefore, in order for plaintiff to succeed in its challenge to the AAO's decision, it must establish that each of these bases was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A) (instructing a reviewing court on what grounds it should set aside an agency action); *see also Khamisani v. Holder*, No. H–10–0728, 2011 WL 1232906, at *8 (S.D.Tex. Mar. 31, 2011) (unpublished) (noting that when the AAO denies a petition on multiple grounds, a challenge can succeed only if each of the stated grounds violates the agency's authority); *Braintree Elec. Light Dep't v. Fed. Energy Regulatory Comm'n*, 667 F.3d 1284, 1293 n. 8 (D.C.Cir.2012) ("When an agency offers multiple grounds for a decision, we will affirm the agency so long as any one

of the grounds is valid, unless it is demonstrated that the agency would not have acted on that basis if the alternative grounds were unavailable.") (quoting *BDPCS, Inc. v. FCC*, 351 F.3d 1177, 1183 (D.C.Cir.2003)).

## A. Two Years Prior Work Experience

### 1. Statutory Basis

The I–140 petition sought to establish Mohammad's status as a "skilled worker." The statute defines "skilled workers" as "[q]ualified immigrants who are capable, at the time of petitioning for classification ... of performing skilled labor (requiring at least 2 years training or experience), not of a temporary or seasonal nature, for which qualified workers are not available in the United States." 8 U.S.C. § 1153(b)(3)(A)(i); 8 C.F.R. § 204.5(*l*)(2). Evidence of qualified experience or training may be presented "in the form of letter(s) from current or former employer(s) or trainer(s) and shall include the name, address, and title of the writer, and a specific description of the duties performed by the alien or of the training received." 8 C.F.R. § 204.5(g)(1). If such evidence is unavailable, other documentation will be considered. *Id.*

### 2. The Evidence and the AAO's Decision

Plaintiff initially submitted a one-page letter from Shiza, Inc. as evidence of Mohammad's prior work experience. (AR 530.) The letter was dated March 14, 2007, and signed by Jamal Tajuddin ("Tajuddin"), the owner and president of Shiza, Inc. (*Id.*) On May 21, 2008, the USCIS indicated that it had discovered a discrepancy between the work history section of the Form ETA–750B submitted with plaintiff's I–140 petition and the work history section of a G–325A form Mohammad sub-

mitted to support his I–485 Application for Adjustment of Status: [3]

> According to the G325 (A) that was submitted with the I495 [sic] and signed and dated on September 25, 2006, the beneficiary Imroze Mohammed failed to disclose any employment history. It must be noted that this Biographic Information (G325) clearly states that *"Severe penalties are provided by law for knowingly and willingly falsifying or concealing material fact."* Again, the beneficiary signed and dated this form on September 25, 2006. According to certified ETA750 part 15 Work Experience the beneficiary has been employed by Z–Noorani Inc [sic] as an assistant manager from November 2000—to present and Shiva Inc. [sic] as a shift manager from October 1998—November 2000. This ETA750 (B) was also signed and dated on August 10, 2006 under the penalty of perjury that the foregoing information is true and correct. It is incumbent upon the Petitioner to resolve any inconsistencies in the record by independent objective evidence.

(AR 619–20 (emphasis in original).)

To address this discrepancy, plaintiff submitted an affidavit from Mohammad which explained that he was facing removal proceedings before the Immigration Court at the time he signed the G–325A form. (*Id.* at 650.) According to Mohammad, his attorney prepared his I–485 forms and left the section on employment history in the G–325A blank "due to a lack of preparation time." (*Id.*) The USCIS ultimately denied plaintiff's I–140 petition on this basis, finding that plaintiff failed to submit "independent objective evidence to overcome the discrepancy in the record." (*Id.* at 502 (citing *Matter of Ho,* 19 I. & N. Dec. 582, 591–92 (BIA 1988)).)

In plaintiff's motion to reconsider, plaintiff submitted "independent objective evidence" that Mohammad had worked for Shiza, Inc. from October 1998 through December 2000. This evidence included:

1) Daily cash register reports for Saad's Express, dated 2/9/00 and 3/2/99, with the notation "Cashier # 8 Imroze" printed on them (AR 370); 2) A check issued to Georgia Department of Revenue from Saad's Express dated 4/8/98, signed by [Imroze] Mohammad (AR 388); 3) A 1998 'Customer Development Agreement' between PepsiCo and Saad's Express, signed by [Imroze] Mohammad (AR 392–400); 4) several invoices from vendors to Saad's Express, dated throughout 1998, to the attention of [Imroze] Mohammad (AR 402–408); 5) correspondence from Security Check, LLC, addressed directly to Imroze Mohammed at Saad's Express, dated throughout 2000, relating to monitoring of certified checks issued at the convenience store (AR 410–416); 6) Collection letters addressed to Imroze Mohammed at Saad's Express from 1998 for outstanding invoices to Frito–Lay (AR 418–426); Inventory delivery receipts from various venders, signed by [Imroze] Mohammed as receiver, dated 10/1999 through 1/2000 (AR 428–456).

(Pl.'s Mot. Summ. J. 16–17.) Plaintiff also submitted three, one-paragraph, notarized letters from individuals who knew or worked with Mohammad while he worked at Shiza, Inc. (AR 484–86.)

In its First NDI, the AAO stated that this evidence still failed to establish whether Mohammad "worked for Shiza, Inc. from 1998 to 2000, and whether Shiza, Inc. [was] a convenience store." (*Id.*) First, while Mohammad's work experience stated

---

**3.** According to plaintiff, "[o]ne requirement for [the I–485 Application for Adjustment of Status] is to submit a form G–325A, which requests certain biographical information, including employment history." (Pl.'s Mot. Summ. J. 16, ECF No. 15.).

that he was employed with Shiza, Inc. from 1998 to 2000, the receipts and invoices simply indicated that Mohammad was working for Saad's Express, the store currently owned and operated by plaintiff. (*Id.* at 230–31.) Second, while one invoice was addressed to Shiza, Inc., the address listed for Shiza, Inc. was identical to plaintiff's current address, 5105 McEver Road, and different from the address listed for Shiza, Inc. on plaintiff's Form ETA–750B (2664 Thurleston Lane). (*Id.* at 231; *see also* AR 425.) This caused the AAO to question "the actual existence of Shiza, Inc." (*Id.* at 231.) Finally, Tajuddin was identified in the record as the owner and president of Shiza, Inc. and as an employee of GAINS BB 2300, Inc. ("GAINS BB"), a company that had previously filed an I–140 petition on Mohammad's behalf (the "2003 Petition"). (*Id.* at 231 n. 8.) Tax forms submitted with the 2003 Petition listed Tajuddin's home address as 2664 Thurleston Lane, the same address listed for Shiza, Inc. on plaintiff's Form ETA–750B. (*Id.* at 231.) The AAO believed these inconsistencies presented an "additional ground for denial." (*Id.* at 232.)

In response, plaintiff explained that Shiza, Inc. had previously owned and operated Saad's Express and had employed Mohammad there. (*Id.* at 235–36.) Plaintiff purchased Saad's Express from Shiza, Inc. in 2000, and Mohammad continued to work there as plaintiff's employee. (*Id.* at 235, 250.) Plaintiff also submitted a copy of a Security Deed which named both Shiza, Inc. and plaintiff as the grantor of certain property (*id.* at 250), pictures of Saad's Express, (*id.* at 259–64), an insurance coverage declaration on behalf of Shiza, Inc. for the policy period from July 1997 to July 1998, (*id.* at 268), a Google search for Saad's Express indicating its existence as

a convenience store, (*id.* at 271–72), tax information indicating that 2664 Thurleston Lane was a single family residence owned by Tajuddin's wife, (*id.* at 278), and a copy of the Georgia Secretary of State's business records for GAINS BB and Shiza, Inc., (*id.* at 280, 282).

In its final decision, the AAO found that plaintiff failed to establish that Mohammad possessed two years of experience as of the Priority Date. (*Id.* at 4.) In so concluding, the AAO pointed to the following discrepancies in the AR. First, none of the letters confirmed whether Mohammad worked part-time or full time for Shiza, Inc. (*Id.* at 7); *see also* 8 C.F.R. § 204.5(g)(1) (noting that letters from former employers "shall include the name, address, and title of the writer, and a *specific* description of the duties performed by the alien or of the training received") (emphasis added). Second, there were two discrepancies between the 2003 Petition and plaintiff's petition: (1) Mohammad claimed only one prior job in the 2003 Petition even though the form was dated approximately five months after he allegedly started working for plaintiff;[4] and (2) Mohammad's signatures on the Form ETA–750Bs submitted with the two petitions were "completely different." (*Id.*)

Third, the evidence regarding the purchase of Saad's Express by plaintiff was inconclusive. While plaintiff's counsel contended that the Security Deed "memorializ[ed] the purchase transaction" between plaintiff and Shiza, Inc., the AAO disagreed. The Security Deed did not identify a street address for the property being transferred, identified *both* Shiza, Inc. *and* plaintiff as the grantors of the property and joint debtors on a $977,985.50 promis-

---

4. This job was with Shiza, Inc. (AR 107.) Notably, the address listed for Shiza, Inc. in the work experience section of the Form ETA–750B submitted with the 2003 Petition listed Shiza, Inc's address as 2667 Crestworth Lane, Buford, Georgia 30519. (*Id.*).

sory note, and listed the address of both Shiza, Inc. and plaintiff as 124 Morning Glen Court, Suwanee, Georgia 30024. (*Id.* at 8.) A corresponding affidavit from Ramzan Ali simply stated that plaintiff bought Saad's Express from Shiza, Inc. and operated it as Saad's Express thereafter. (*Id.* at 9.) Neither document provided the specific date Saad's Express was purchased or substantiated that the purchase in fact occurred. (*See id.* at 10 ("no date of the purchase of the business from Shiza, Inc. has ever been provided or substantiated").) Fourth, there was no "official document or payroll record, W–2, etc., relevant to [Mohammad's] employment by Shiza, Inc." (*Id.*) Fifth, a letter from Mishely Randall of the Community Bank & Trust dated August 5, 2008, stated that Mohammad had been a customer of the bank since January 19, 2000, through plaintiff. (*Id.* at 11.) This predated petitioner's purchase of Shiza, Inc. and the date Mohammad alleged he began working for plaintiff. (*Id.*)

### 3. Analysis

■ Plaintiff argues that these discrepancies should have no bearing on a determination of whether Mohammad had two years of experience with a previous employer. (Pl.'s Mot. Summ. J. 19.) According to plaintiff, all that is required to show evidence of an alien's employment is an experience letter signed by the alien's former company. (*Id.* at 21 (citing 8 C.F.R. § 204.5(g)(1)).) Plaintiff argues that "[t]he only way [the] letter [from Tajuddin] . . . could have been insufficient was in its omission of whether the employment was full- or part-time. This omission easily could have been resolved . . . [but i]nstead of accepting the initial evidence, Defendants expressed doubt in the authenticity of the evidence and requested more in support. This . . . led down an endless rabbit hole, where each new submission of evidence raised more doubts. . . ." (*Id.* at 23.) According to plaintiff, defendants

"never should have requested any additional evidence in the first place nor had authority to do so." (*Id.*)

■ The court disagrees. While the regulation does not specifically describe what an employment verification letter must contain, it must describe the beneficiary's relevant experience in sufficient detail so that the USCIS can determine whether it is in fact relevant to the position at issue. 8 C.F.R. § 204.5(g)(1). Here, the certified position was for a full-time Store Manager. (AR 532.) Tajuddin's letter was less than a page long and stated as follows:

To whom it may Concern: This will confirm that Mr. Imroze Mohammad worked in this company as Shift Manager from October 1998 until November 2000. In this capacity his duties included the following: Manage employees[;] Prepare employee schedules[;] Hire employees[;] Train employees[;] Manage Inventory[;] Purchase necessary supplies[;] Prepare necessary financial reports and statements[.] Mr. Mohammad was a hard worker and completed all tasks assigned to him. If you require further information with regards to Mr. Mohammad's employment with our company, please do not hesitate to contact me.

(*Id.* at 661.) This cursory list of Mohammad's duties not only failed to clarify whether Mohammad was employed full- or part-time but also failed to describe the nature of Shiza, Inc.'s operations. *See* 8 C.F.R. § 204.5(g)(1) (letters regarding qualified experience or training "shall include . . . a specific description of the duties performed by the alien or of the training received.").

In addition to the shortcomings noted above, the AAO had good reason to doubt the veracity of Tajuddin's statements and the existence of Shiza, Inc. The AR revealed not one but four different addresses

for Shiza, Inc. (AR 81, 107, 251.) This discrepancy, coupled with the close familial relationship between plaintiff, Shiza, Inc., and Mohammad, undermined the credibility of Tajuddin's letter and reasonably raised the AAO's suspicions regarding the legitimacy of Shiza, Inc.

Plaintiff's counsel attempted to resolve these inconsistencies by explaining that plaintiff purchased Saad's Express from Shiza, Inc. in 2000. However, this explanation was not corroborated by any supporting documentary evidence. (*Id.* at 9.) The only evidence provided regarding the transaction between Shiza, Inc. and plaintiff was a Security Deed identifying both entities as grantors of unidentified property and affidavits submitted by Mohammad's parents. (*Id.* at 250.) As the AAO noted, these documents do little to substantiate plaintiff's claim that Shiza, Inc. owned and operated Saad's Express from 1998 to 2000 or that Saad's Express was sold to plaintiff in 2000. *See Matter of E–M–*, 20 I. & N. Dec. 77, 80 (BIA 1989) ("[T]he application of the 'preponderance of the evidence' standard may require the examination of each piece of relevant evidence and a determination as to whether such evidence, either by itself or when viewed within the totality of the evidence, establishes that something to be proved is probably true.").

Plaintiff's counsel also attempted to explain why there were so many different addresses for Shiza, Inc. by explaining that Tajuddin operated Shiza, Inc. from his home at Thurleston Lane. However, Tajuddin's letter listed Shiza, Inc.'s return address as 2664 Thurleston Lane "Suite B." This suggested that Tajuddin had added the superflous "Suite B" to bolster Shiza, Inc.'s appearance as a legitimate business entity separate and apart from plaintiff and further called the reliability of his statements into question. (AR at 9.)[5]

Plaintiff also argues that the AAO unreasonably dismissed the "hundreds of pages of 'contemporaneous' evidence" in the AR. The court disagrees. The AAO correctly found most of this evidence irrelevant because it was from Mohammad's employment with plaintiff, not Shiza, Inc. (*Id.* at 9–10.) Those documents that were relevant were not probative; they established simply that Mohammad had worked at *Saad's Express* in some capacity from January 13, 1998, until February 2007. (*Id.*) They did not indicate Mohammad's role there, whether he worked full- or part-time, or whether Saad's Express was owned and operated by plaintiff or Shiza, Inc.[6] (*Id.*) The three additional letters that attempted to corroborate Mohammad's employment with Shiza, Inc. did not testify as to Mohammad's position at Shiza, Inc., his job title, or his duties. (*Id.* at 10.) They simply stated in conclusory fashion

**5.** While plaintiff argues that the AAO *impermissibly required* more evidence than what was authorized by statute, this ignores the manner in which the evidence came before the AAO. Following the USCIS's initial denial, plaintiff submitted hundreds of pages of contemporaneous evidence to support its motion for reconsideration. The AAO reviewed all of this evidence when plaintiff appealed. When it did so, the AAO found numerous inconsistencies which plaintiff then failed to adequately explain. These inconsistencies, combined with plaintiff's inadequate explanations, ultimately caused the AAO to question the

veracity of Tajuddin, Mohammad, and plaintiff's representations.

**6.** Only one document, a debt collection notice dated March 30, 1998, mentions Shiza, Inc. by name. (AR 425.) The notice was sent to 5105 McEver Road but makes no mention of Mohammad or Saad's Express. (*Id.*) While there are invoices for deliveries to Saad's Express made at or around the same time period, these invoices mention Mohammad by name or allegedly bear his signature but make no mention of Shiza, Inc. (*Id.* at 402–08.).

**1342**

that Mohammad worked for Shiza, Inc. "from 1998 until 2000." (*Id.*)[7]

Plaintiff also argues that the AAO unreasonably discredited the evidence in light of plaintiff's and Tajuddin's familial relationship with Mohammad and thus impermissibly raised plaintiff's evidentiary burden beyond that authorized by statute. However, this argument ignores the fact that the AR is replete with discrepancies that stand apart from any familial relationship, real or presumed, that Mohammad may have had with those testifying on his behalf. For example, the AR contains four different addresses for Shiza, Inc. (*Id.* at 81, 107, 251.) The Form ETA–750B submitted with the 2003 Petition showed only one prior place of employment, Shiza, Inc., while the Form ETA–750B submitted with plaintiff's current petition stated that Mohammad began working for plaintiff in 2000. (*Id.* at 7.) Still yet another form signed by Mohammad showed no employment history at all. Mohammad's signature on the two I–140 petitions was also "completely different," suggesting that they may have been completed by two different people. (*Id.* at 8.) Finally, a letter dated August 5, 2008, from Community Bank & Trust stated that Mohammad had been a customer there since January 19, 2000, through *plaintiff,* even though Mohammad and plaintiff both claimed that he

did not start working for plaintiff until November 2000. (*Id.* at 10.)

The AAO also found the absence of any corporate records from Shiza, Inc.'s day-to-day operations at Saad's Express probative. *See Lu–Ann Bakery Shop, Inc. v. Nelson,* 705 F.Supp. 7, 12 (D.D.C.1988) (noting the INS may consider as evidence the lack of contemporaneous evidence in its determination of whether the beneficiary has the requisite experience). The only documents bearing Shiza, Inc.'s name were a single invoice from 1998 addressed to Shiza, Inc. at McEver Road and the Security Deed which identified Shiza, Inc. and plaintiff as co-grantors under a single address, Morning Glen Court. In light of the close familial relationship between the owners of Shiza, Inc. and plaintiff, their geographic proximity, and the doubts expressed by the AAO regarding Shiza, Inc.'s legitimacy in not one but two NDIs, it was telling that no such documentation was ever submitted by Shiza, Inc.[8]

Therefore, the court finds that the AAO meticulously reviewed the AR and considered each document's relevance, probative value, and credibility, both individually and in the context of the totality of the evidence. It then rationally concluded that it had material doubts about whether Mohammad had the requisite experience. Considering the numerous discrepancies

7. The AAO speculated as to whether these letters were written by relatives of Mohammad, since two of the writers shared the maiden name of Mohammad's wife. (AR 10.) Plaintiff argues that this speculation was improper because the AAO then unreasonably assumed that the letters were not credible. (Pl.'s Reply 5, ECF No. 20.) However, the AAO did not discount these letters just because it speculated the authors were related to Mohammad. It discounted them because they were sparsely written, were inconsistent with Mohammad's and plaintiff's sworn statements, and failed to confirm his position, job title, or duties at Shiza, Inc. (AR 10.) Accordingly, they had little probative value.

8. Plaintiff argues that it "has no access to another entity's tax documents or authority to obtain them." (Pl.'s Reply 2 n. 1.) Three pages later, however, plaintiff notes that "it is no secret that many of the owners and employees in the businesses involved in this case are related to each other. Such is the nature of family businesses." (*Id.* at 5.) Tajuddin was the beneficiary's brother-in-law, and the Security Deed suggests that Shiza, Inc. and plaintiff have a close working relationship. Despite noting that it lacks the legal authority to request Shiza, Inc.'s tax records, plaintiff has offered no explanation why Shiza, Inc. was unwilling to request or provide these documents on plaintiff's behalf.

and omissions discussed above, the court cannot conclude that the AAO's decision was "arbitrary or capricious." *Cf. Fund for Animals, Inc.*, 85 F.3d at 541 (The "reviewing court is not authorized to substitute its judgment for that of the agency concerning the wisdom or prudence of the proposed action.").

## B. Continuing Ability to Pay

### 1. Statutory Basis

As part of the I-140 petition process, the petitioner must demonstrate that it has the continuing financial ability to pay the proffered wage from the Priority Date onward. 8 C.F.R. § 204.5(g)(2). "Evidence of this ability shall be either in the form of copies of annual reports, federal tax returns, or audited financial statements.... In appropriate cases, additional evidence, such as profit/loss statements, bank account records, or personnel records, may be submitted by the petitioner or requested by the [USCIS]." *Id.*

The USCIS has established three primary methods by which an employer can conclusively establish its ability to pay the proffered wage. *Taco Especial v. Napolitano*, 696 F.Supp.2d 873, 878 (E.D.Mich. 2010). First, an employer can show that he is already employing the alien beneficiary at a wage equal to that specified in the Form ETA–750. *Id.* at 878–79 (citing USCIS Memorandum on the Determination of Ability to Pay under 8 C.F.R. § 204.5(g)(2), (May 4, 2004)). (*See also* AR 11 (noting the USCIS first examines whether the petitioner employed and paid the beneficiary during the relevant period).) If the petitioner cannot establish this, the USCIS will then examine whether

the employer's yearly net income exceeds the expected yearly wage specified in the Form ETA–750. *Taco Especial*, 696 F.Supp.2d at 879. (*See also* AR 12 (noting USCIS next considers net income figure on petitioner's federal income tax return, without considering depreciation or other expenses).) Finally, the USCIS will consider whether an employer's net current assets exceed the expected yearly wage specified in the Form ETA–750. *Taco Especial*, 696 F.Supp.2d at 879. The US-CIS may also consider any other evidence provided by the petitioner, such as the overall magnitude of the petitioner's business, the historical growth of petitioner's business, or the number of years the petitioner has been in business, to find that an employer has the ability to pay the proffered wage. (AR 15–16 (citing *Matter of Sonegawa*, 12 I. & N. Dec. 612 (1967)).)

### 2. The Evidence and the AAO's Decision

The Labor Certification indicated that the position would have a proffered wage of $36,650 per year. (*Id.* at 532.) To verify that it had the ability to pay this wage, plaintiff submitted copies of Mohammad's W–2s and Form 1099s and plaintiff's corporate income tax returns from 2001 until 2008. (*Id.* at 12, 158–69, 173–79.)

Since Mohammad was paid at least $10,000 less than the proffered wage from 2001 until 2006, the AAO turned to the net current assets [9] reflected on plaintiff's income tax returns to determine whether plaintiff could in fact pay the proffered wage. (*Id.* at 12.) The AAO stated that these records reflected plaintiff's net assets for each year as follows:

---

**9.** Net current assets is the difference between a company's current assets and its current liabilities. (AR 13.) "If the total of the petitioner's end-of-year net current assets can cover the proffered wage or cover the differ-ence between the actual wages paid to the beneficiary and the proffered wage, the petitioner is expected to be able to pay the proffered wage during that period of time using those net current assets." (*Id.*).

| Year | Net Income | Current Assets | Current Liabilities | Net Current Assets |
|------|-----------|----------------|---------------------|--------------------|
| 2001 | $ 568 | $ 84,616 | $24,138 | $ 60,478 |
| 2002 | $ 3,230 | $119,247 | $29,528 | $ 89,719 |
| 2003 | $23,217 | $110,572 | $17,146 | $ 93,426 |
| 2004 | $41,449 | $124,453 | $18,542 | $105,911 |
| 2005 | $42,259 | $115,228 | $ 8,178 | $107,050 |
| 2006 | $41,862 | $127,214 | $ 8,698 | $118,516 |
| 2007 | $36,931 | $139,341 | $21,910 | $117,431 |

(*Id.* at 14.) The total salaries and wages paid in those years are listed below:

| Year | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|------|------|------|------|------|------|------|------|
| Salaries & Wages | $20,309 | $17,486 | $15,909 | $0 | $33,847 | $41,738 | $68,261 |

(*Id.*)

In its Second NDI, the AAO indicated that it had found several inconsistencies between the information on plaintiff's tax forms and its representations about Mohammad's employment. First, Mohammad had represented under oath that he had worked for plaintiff from November 2000 until August 2006 for 40 hours a week. (*Id.* at 58.) However, plaintiff's 2004 income tax return indicated that plaintiff paid no salaries or wages that year. (*Id.*) To explain this inconsistency, the AAO requested "copies of all paychecks, IRS Forms 1099–MISC, Miscellaneous Income, and IRS Forms W–2, Wage and Tax Statement, issued by [plaintiff] to [Mohammad] for all years from 2000 through 2008." (*Id.*) Second, the AAO noted that plaintiff paid only minimal salaries in all other relevant years, even though the Labor Certification indicated that Mohammad would be supervising three to four employees. (*Id.* at 58–59.) To resolve this discrepancy, the AAO asked plaintiff to submit "all IRS Forms 941, Employer's Quarterly Federal Tax Return filed by [plaintiff] in each quarter of 2007 and 2008," and "all IRS Forms 1099 and IRS Forms W–2 issued ... to employees other than the beneficiary for all years from 2000 through 2008." (*Id.* at 59.)

Although plaintiff believed it was "irrelevant ... whether a salary was paid to the beneficiary in 2004," it provided a Form 1099 for Mohammad for 2004, as well as copies of W–2s or 1099s issued from 2000 until 2008. (*Id.* at 50.) Additionally, plaintiff provided "updated information that since April 2007, [it] has had at least a total of 5 employees," as evidenced by "Georgia and federal quarterly tax reports for 2007–2008." (*Id.*) While plaintiff provided W–3 reports from 2000 through 2008, it did *not* provide all the W–2s issued to employees other than Mohammad from that same time period because it believed "the years 2000–2006 [were] irrelevant." (*Id.*) Instead, plaintiff provided only W–2s from 2007 and 2008. (*Id.*)

In its final decision, the AAO noted the following deficiencies with plaintiff's tax information: (1) plaintiff paid minimal salaries for the relevant years; (2) no cost of labor was shown on any of the returns; (3) there was no explanation as to why Mohammad was issued a Form 1099 in 2003 and 2004 and W–2s in other years; (4) no federal income tax withholding was shown on Mohammad's 2005 and 2006 W–2s, and (5) the W–3s for 2002, 2005, 2006, and 2007 did not correspond with the total salaries and wages represented in plaintiff's tax returns. (*Id.* at 15.) The AAO believed these discrepancies called the accuracy of

plaintiff's tax documentation into question. (*See id.* (noting "[d]oubt cast on any aspect of the petitioner's proof may, of course, lead to a reevaluation of the reliability and sufficiency of the remaining evidence") (citing *Matter of Ho*, 19 I. & N. Dec. at 591–92).)

The AAO also noted that plaintiff had petitioned for at least one other beneficiary on April 14, 2003 and that this petition had been approved on September 3, 2004. (*Id.* at 11.) This beneficiary received permanent status on March 30, 2005. (*Id.*) According to the AAO, "where a petitioner files I–140 petitions for multiple beneficiaries, it is incumbent on the petitioner to establish its continuing financial ability to pay all proposed wage offers as of the respective priority date of each pending petition." (*Id.*) However, plaintiff had offered no information regarding this individual and had declined to provide the W–2s and 1099s requested by the AAO. Without this information, the AAO stated that it could not "conclude that petitioner has established its continuing ability to pay the proffered wage in this case from each respective priority date until March 30, 2005, [the date] the beneficiary in the other case obtained permanent residency." (*Id.* at 15.)

### 3. Analysis

▉ Plaintiff argues that the AAO improperly ignored its own procedures by determining that plaintiff could not pay the proffered wage from certain inconsistencies in plaintiff's tax information despite the fact that plaintiff's net current assets exceeded the proffered wage. (Pl.'s Mot. Summ. J. 26.) The court agrees that the inconsistencies noted by the AAO would not normally be probative of an employer's ability or inability to pay a proffered wage. The facts that Mohammad was issued 1099s some years instead of W–2s, plaintiff paid no salaries or wages in 2004, and plaintiff generally paid low salaries are not necessarily probative of whether plaintiff could have paid the proffered wage. The key is plaintiff's continuing *ability* to pay, not what it actually paid or how it paid it.

Additionally, while the court can foresee situations where the existence of other sponsored beneficiaries might be relevant to an ability to pay determination, the AAO does not identify the name of this beneficiary or the full application number of the I140 it refers to, and a copy of this application does not appear in the AR. In fact, there appears to be no discussion of this I–140 anywhere in the AR apart from the AAO's final decision. The government's failure to submit this information, which was obviously a factor considered by the AAO in reaching its final determination, makes it difficult for the court to evaluate whether the AAO's decision was arbitrary or capricious. *See Liu v. U.S. Attorney Gen.*, 440 Fed.Appx. 718, 719 (11th Cir.2011) (*per curiam*) ("[A]n agency fails to give reasoned consideration to the record evidence when it misstates the contents of the record, fails to adequately explain any illogical conclusions, or provides justifications for its decision which are unreasonable or do not respond to any arguments in the record."); *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985) ("[I]f the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."). Had this been the only basis for the AAO's decision, the court might very well find that it was in fact arbitrary and capricious.

Nevertheless, it was not unreasonable for the AAO to find that discrepancies in plaintiff's financial records undermined plaintiff's credibility. The extremely low salaries paid by plaintiff certainly under-

mine its testimony that Mohammad was employed as a full-time store manager from 2000 to 2008 and had three to four employees under his supervision during that time. The additional discrepancies between plaintiff's W–3s and the total salaries and wages listed on its corresponding returns gave the AAO reason to doubt the veracity of the numbers reflecting plaintiff's net current assets. (AR 15.) The records also provided no confirmation that Gilani, the original beneficiary, had ever actually been employed by plaintiff. (*Id.* at 20 n. 16.) [10]

Plaintiff argues that the AAO must ignore such inconsistencies if it finds evidence that satisfies at least one of the three methods of proving an ability to pay. (Pl.'s Reply 12.) The court disagrees. Plaintiff's argument ignores the statutory and regulatory discretion afforded to the USCIS. *Cf. Taco Especial,* 696 F.Supp.2d at 879 ("[T]he USCIS has the discretion to consider any other evidence provided by the petitioner and may use it to find that an employer has the ability to pay the proffered wage."). It is well understood that under certain circumstances, the USCIS may feel the need to consider other evidence, such as the overall magnitude of the petitioner's business, the historical growth of petitioner's business, or the number of years the petitioner has been in business, to find that an employer has the ability to pay the proffered wage. (AR 15–16 (citing *Matter of Sonegawa,* 12 I. & N. Dec. at 612).) While such circumstances normally arise when a petitioner cannot submit evidence of an ability in accordance with one of the three established methods, the court sees no reason why it should not also encompass situations where the AAO has reason to doubt the accuracy of plaintiff's financial documentation. *Cf. Just Bagels Mfg., Inc. v. Mayorkas,* 900 F.Supp.2d 363, 374–76 (S.D.N.Y.2012) (finding failure to submit particularized evidence or explanation in response to an express request for additional evidence, in conjunction with inconsistent representations regarding beneficiary's employment, provided a rational basis for denying plaintiff's I–140 petition).

Here, the AAO discovered inconsistencies on plaintiff's tax forms and attempted to resolve them by specifically requesting the W–2s of plaintiff's other employees. (AR 15.) Rather than complying with the AAO's request, plaintiff refused to submit this information after it made an independent determination that it was irrelevant. (*Id.* at 50–51.) Accordingly, the AAO concluded plaintiff had failed to satisfy its burden of proof on this issue. (*Id.* at 16.) Given the inconsistencies in the record and plaintiff's corresponding conduct, the court cannot say that the AAO's actions were arbitrary or capricious. *Cf. Fund for Animals, Inc.,* 85 F.3d at 541 (The "reviewing court is not authorized to substitute its judgment for that of the agency concerning the wisdom or prudence of the proposed action.").

### C. Job Offer Not Bona Fide

As the court has examined two of the three alternative grounds for the AAO's decision and concluded that both provided independent and valid reasons for denying plaintiff's petition, the court sees no reason to address the merits of the AAO's third and final basis for denial: that the job offer was no longer bona fide. *Cf. Khami-*

---

**10.** The AAO specifically requested "evidence as to the present circumstances of Ms. Gilani" in the First NDI. (AR 77.) In response, plaintiff stated that "Gilani was contacted to provide an affidavit of why she chooses not to go forward with the Petitioner and her present circumstances but she declined." (*Id.* at 238.) Instead, plaintiff provided an affidavit from Zubaida Mohammad regarding Gilani's circumstances and a phone number where Gilani could be reached. (*Id.* at 239.).

1347

*sani*, No. H–10–0728, 2011 WL 1232906, at *8 (noting that when the AAO denies a petition on multiple grounds, a challenge can succeed only if each of the stated grounds violates the agency's authority); *Braintree Elec. Light Dep't*, 667 F.3d at 1293 n. 8 ("When an agency offers multiple grounds for a decision, we will affirm the agency so long as any one of the grounds is valid, unless it is demonstrated that the agency would not have acted on that basis if the alternative grounds were unavailable.") (quoting *BDPCS, Inc.*, 351 F.3d 1177, 1183 (D.C.Cir.2003)).

## V. Insinuations of Fraud or Intentional Misrepresentation

Plaintiff also takes issue with the insinuations of fraud or material misrepresentation in the AAO's final decision. (*Id.* at 34.) Plaintiff is concerned that a finding of misrepresentation or fraud will be presumed in future immigration filings by plaintiff or Mohammad. "Particularly in the case of the beneficiary, ... a finding by USCIS that he made a material misrepresentation in order to obtain an immigration benefit would be a ground of inadmissibility that would make him permanently ineligible for any immigration benefit." (*Id.* at 34 (citing 8 U.S.C. § 1182(a)(6)(C)(i)).) To avoid this possibility, plaintiff requests that the court make a finding that "neither Plaintiff of [sic] its beneficiary made a material misrepresentation with regard to any aspect of this case." (*Id.* at 25.) The government has not responded to this request.

The court is troubled by the insinuations of fraud contained in the AAO's final decision. (AR 7, 18, 20.) An alien who fraudulently or willfully misrepresents a material fact faces serious consequences. *See* 8 U.S.C. § 1182(a)(6)(C)(i) ("Any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this chapter is inadmissible."). Such insinuations should not be made lightly. Additionally, the numerous discrepancies that caused the AAO concern here could have been caused by any number of things, including ignorance or attorney error.

However, the court is not prepared to conclusively find that there was no fraud or willful misrepresentation committed in this case. As discussed above, there were significant discrepancies in the documentary evidence submitted by plaintiff. While the AAO declined to find that these discrepancies amounted to fraud or willful misrepresentation, they certainly shaped its ultimate conclusions on the issues discussed above. As these suspicions were rationally derived from the numerous inconsistencies contained in the AR, the court will not substitute its own judgment for that of the AAO and will not make an independent finding on this issue.[11]

## VI. Attorney's Fees

 Although not specifically requested in its motion for declaratory judgment,

---

11. Furthermore, unlike an express finding of fraud or willful misrepresentation, the insinuations contained in the AAO's decision do not require the USCIS to deny every future petition or application submitted by Mohammad or plaintiff, and a denial based on the AAO's decision in this case would not be proper unless it was supported by other evidence in the record. *See Matter of Tawfik*, 20 I. & N. Dec. 166 (BIA 1990) ("Ordinarily, the district director should not give conclusive effect to determinations made in a prior proceeding, but, rather, should reach his own independent conclusion based on the evidence before him."); *Avitan v. Holder*, No. C–10–03288 JCS, 2011 WL 499956, at *11 (N.D.Cal. Feb. 8, 2011) (rejecting assertion that USCIS erred by giving conclusive weight to denial of first petition by noting that the USCIS did not rely solely on the first denial but considered other evidence as well).

plaintiff also requested attorney's fees pursuant to the Equal Access to Justice Act ("EAJA"). (Compl. 22, ECF No. 1.) The EAJA allows civil litigants to recover attorney's fees they have incurred in a civil action against the United States if they are the prevailing party and the position of the United States was not substantially justified or special circumstances do not make such an award unjust. 28 U.S.C. § 2412(d)(1)(A). Here, plaintiff is not the "prevailing party." It is therefore not entitled to its attorney's fees under the EAJA. *Id.*

### VII. Conclusion

For the foregoing reasons, plaintiff's "Claim for Declaratory Judgment" [15], plaintiff's "First Motion to Supplement and File Under Seal" [16], and plaintiff's "Second Motion to Supplement the Record" [17] are hereby **DENIED.** Defendants' "Response to Plaintiff's Motion for Judgment and Cross–Motion for Summary Judgment" [18] is hereby **GRANTED.**